## STUMPF v. A. SCHREIBER BREWING CO.

(District Court, W. D. New York. March 16, 1917.)

### No. 160-B.

Patents ☞328—Validity—Infringement.

Claims 1, 2, 3, 4, and 8 of the Stumpf patent, No. 1,042,168, for an improvement in steam engines, *held* valid and infringed, but claim 18 *held* not infringed.

In Equity. Suit by Johann Stumpf against the A. Schreiber Brewing Company. Decree for complainant for part of the relief sought.

Bartlett & Chamberlain, of Buffalo, N. Y. (John P. Croasdale, of Philadelphia, Pa., and Cleon J. Sawyer, of New York City, of counsel), for plaintiff.

J. C. Sturgeon, of Erie, Pa., and George E. Tew, of Washington, D. C. (Melville Church, of Washington, D. C., of counsel) for defendant.

HAZEL, District Judge. The bill alleges infringement of United States letters patent No. 1,042,168, applied for April 18, 1908, and granted to Johann Stumpf October 22, 1912, for an improvement in steam engines. The patent is for a combination of old elements, consisting of an engine cylinder, piston, inlet ports, exhaust ports, and

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

heating jacket, which, as complainant claims, operated in a new way and produced a new and useful result.

The general defense is noninfringement; the specific defenses being that the claims have been improperly broadened, that the substance of the invention is disclosed in prior patents and publications, and that no practical improvement resulted from the combination and arrangement of parts. The defendant is a user of an engine constructed by the Skinner Engine Company of Erie, Pa., which complainant claims substantially embodies his invention.

The characteristics of single cylinder engines of the counterflow and uniflow types have, of course, been known and understood by the skilled in the art for many years. In counterflow engines the steam enters the cylinder at one end, and, after expansion, returns with the piston out into the air through exhaust ports located at the same end at which it entered, while in the uniflow engine—the type of engine with which we are herein concerned—the hot steam enters the cylinder at one end, and, always flowing in the same direction, exhausts at ports located at opposite ends, or at points removed from the inlet end, after its energy has been practically expended; the exhaust ports being opened by the piston stroke. In engines of the condensing type, the steam is usually exhausted into a chamber having pressure lower than atmospheric; but, when operating as noncondensing, the steam is discharged, either into the atmosphere or into a chamber having pressure greater than atmospheric. In compound or multiple engines, two or more cylinders are commonly used, through which the steam flows in series, with the result that initial condensation is greatly reduced. The object of the patentee herein was primarily to eliminate loss of steam from initial condensation in single cylinder engines, as distinguished from compound engines, and to entrap and compress the dry steam remaining after expansion, so as to improve the thermal conditions of such engines.

The first question is whether Stumpf discovered a new principle of operation. Upon the determination of this question depends the character of the patent and the interpretation and scope of the claims, in view of the file wrapper and the prior art. It is practically conceded that all the elements of the claims in controversy, separately considered, were old; reliance being placed upon the new combination by which beneficial results were attained. It should be understood that cylinder walls ordinarily are comparatively cooler than the entering steam, owing to the moisture which has adhered thereto and absorbed the heat, and that the cylinder in turn absorbs heat from the steam after admission and as it expands in driving the piston, thus producing initial condensation, which decreases the economic efficiency of the engine. The patentee designed to keep the inlet end of the cylinder, including the cylinder walls, absolutely dry at all times, during expansion, at the completion of the piston stroke, and while the expanded steam was exhausting, for at such times absorption of heat from the interior walls was most marked. To accomplish his object he placed heating jackets or chambers at the extreme inlet end of the cylinder, and exhaust ports around the center, away from the inlet end, to keep them cold and unaffected by the hot steam, and adapted an elongated

piston to isolate the moisture from the hot zone after the expanded steam has exhausted through ports opened by the piston stroke. The elongated piston, not only controls the outlet port, or ports, but serves to protect the cylinder walls from the effects of the expanded steam by failing to contact the cylinder walls in its traveling, owing to clearance, with the result that the dry steam remaining in the cylinder after the expanded steam and the wet steam have been exhausted is compressed, on the return stroke of the piston, against the hot inlet end, while the exhaust ports are covered by the piston, thus making it possible to intensify the steam heat at the inlet end, and almost entirely to prevent initial condensation. Of this the specification says:

"Means for bringing the working steam at the end of expansion into layers of decreasing dryness toward the exhaust while the piston uncovers the exhaust ports to let this wettest steam pass off, and then on the reversal of its motion covers the exhaust ports and retains them covered while the cylinder heated, drier steam is trapped and compressed up to the inlet end."

It is believed that the patentee by his adaptation improved thermal conditions in uniflow engines, secured increased expansion in a single cylinder, and made it practical to close the inlet valve before the piston reached the full stroke, and in this way minimized steam losses. The specification refers in detail to specific means for injecting steam into the annular chambers, or partial jackets, as they are called, 7 and 8, connected with annular chambers 11 and 12 formed in projections from the cylinder covers to correspond in length to the distance of travel of the piston from the dead center to the cut-off. These partial jackets are unlike the jackets commonly employed to entirely surround the cylinder for the purpose of keeping both the inlet and exhaust ports heated, but they are distinctively heating jackets particularly for heating the end of the cylinder and the cylinder inlet. Chambers 11 and 12 are provided with valves for admitting steam into the cylinder proper, and there are specified means for creating a hot zone at the inlet end and a cold zone at the exhaust ports, the latter leading into an annular space around the cylinder, which is partitioned from the inlet and heating covers or jackets by an unjacketed or unheated portion to create a cooling belt or space "in the neighborhood of the exhaust."

The use of a long piston in an engine cylinder was not unknown in the art, but the piston of the patent in suit—an elongated piston—was particularly adaptable for controlling the exhaust ports to prevent the exhaust of expanded steam from circulating in the hotter space and for coacting with the essential features of engines operated upon the uniflow principle. The specification also refers to intermediate ports in the walls of the cylinder (45, 46, 47, and 48) "for utilizing the exhaust steam," controlled by the piston and by automatic nonreturn valves (55, Fig. 2), and connected to pipes (52 and 53).

We may now refer to the claims in controversy. The first, second, third, fourth, eighth, and eighteenth are relied upon. They read as follows:

1. The combination with a steam engine cylinder having an inlet port and an exhaust port distant therefrom, of means for heating the steam within the cylinder near the inlet port, a relatively cold chamber into which the

exhaust port leads, and an elongated piston working in the cylinder and adapted to uncover the exhaust port as the piston nears the end of its working stroke and to keep said port closed and to cover and protect the adjacent interior portion of the cylinder during the remainder of its operating cycle.

2. In combination with a cylinder having an inlet port at its end and an exhaust port intermediate in its length, means for heating the steam near the inlet end during the expansion and compression comprising a hot partial jacket at the inlet end of the cylinder, means for bringing the working steam at the end of expansion into layers of decreasing dryness toward the exhaust, comprising a cold exhaust steam belt around the exhaust ports and into which said exhaust ports open directly, said hot jacket and cold belt being spaced apart with an unjacketed portion of the cylinder extending between and means for allowing said wettest steam to pass off unheated at the end of expansion and to trap and compress heated steam comprising an elongated piston working in said cylinder and adapted to uncover said exhaust ports at the end of expansion and retain said ports covered and the interior of the cylinder out of connection with the exhaust belt during compression, substantially as described.

3. In a steam engine, the combination with a working cylinder having an inlet port at its end and separate exhaust ports and a working piston in said cylinder adapted to uncover said exhaust ports at the end of the working stroke and also to retain them covered during expansion and compression of the steam, of means for securing graduation of the steam in zones of driest steam near the inlet end and wettest steam near the exhaust ports consisting of a partial jacket about the inlet end of said cylinder and from which jacket said cylinder inlet port leads, a live steam supply pipe to said jacket and a valve controlling the admission of live steam from said jacket to the cylinder through said inlet port.

4. In a steam engine in combination with a cylinder having exhaust ports therein and a piston working in said cylinder and adapted at and near the end of its working stroke to uncover said exhaust ports and during expansion and compression of the steam to retain said exhaust ports covered, means for securing graduation of the steam in zones of driest steam near the inlet end and wettest steam near the exhaust ports consisting of a hollow cover having a live steam inlet port therein leading to the cylinder, a live steam supply pipe to said hollow cover, and a valve in the live steam port leading from said hollow cover to the cylinder for controlling the admission of steam to said cylinder.

8. In combination with the cylinder of a uni-directional flow engine, a hot partial jacket on the inlet end of said cylinder and means for insulating said hot jacket from the cold parts of the cylinder steam space.

18. In a steam engine, a cylinder having steam inlet ports and also exhaust ports arranged at different points axially in the cylinder, a working piston adapted to uncover said exhaust ports in its travel and means other than the working piston for closing as desired all the said exhaust ports except the last ports uncovered by the piston in its stroke.

It will be observed that claim 1 broadly specifies means for keeping the steam hot near the inlet port, and includes the elongated piston for controlling the exhaust ports to protect the cylinder walls. Claim 2 includes in combination a hot partial jacket at the inlet end and a cold exhaust steam belt spaced apart with an unheated part of the cylinder. In claim 3 is emphasized the creation of temperature zones of driest steam near the inlet and wettest zones near the exhaust, while claim 4 is for a jacket or hollow cover having a valve leading to the cylinder. Claim 8 refers to means for insulating the partial jacket from the cold belt, and claim 18 to means, other than the working piston, for covering all the exhaust ports "except the last ports uncovered by the piston in its stroke."

Defendant claims that any novelty there may be in the patent resides, first, in the particular construction of the annular chambers *11* and *12* formed in cylindrical projections from the cylinder cover for the purpose of enlarging the space in the cylinder proper by counterboring, and which it was contended required a long piston to correspond thereto; second, in the auxiliary ports communicating with pipes between the inlet end and exhausts, and the feature of closing them with nonreturn valves and opening them when the piston moves forward to discharge a little of the expanded steam; and, third, that in other respects the engine operated similarly to uniflow engines of the prior art. It is not believed, however, that the patent in controversy is limited to the actual construction described in the specification.

As defendant's expert has pointed out, not only were uniflow engines well known to the art, but at the date of the invention it was old to place exhaust ports in the center of the cylinder of a double-acting uniflow engine and at the extreme end away from the inlet end in a single-acting engine. Nor was it new to admit the steam at the initial piston stroke and exhaust the same through ports located at a distance from the inlet so that it would not return thereto. In the patent to Eaton, No. 17,142, for example, there is shown a long piston for controlling a central exhaust operating to cover and uncover the same; but such patent disclosed no heating jacket at the cylinder head, and was utterly unable to achieve the results in suit.

The Westinghouse patent, No. 240,482, has a hollow air cylinder, but it was unheated, being used merely to prevent heat radiation; the steam being admitted through the hollow cylinder end. The principle of the patent in suit, however, was not disclosed or even suggested. While the drawings attached to the Westinghouse patent show a long piston for keeping the exhaust ports closed, except when the steam escapes, there nevertheless was a complete failure to appreciably decrease initial condensation, owing quite likely to the absence of a heated jacket at the cylinder head—an essential feature of the Stumpf patent.

The Willans patent approximates the patent herein considered, being provided with a steam jacket at the inlet and a cold exhaust belt connected with the jacket by the intervening walls of the cylinder; but it is not anticipatory, as the piston element in such construction was incapable of performing the functions of the elongated piston of the involved claims. The Willans engine piston was of a peculiar design. It had a central valve located inside of the piston rod, which, on discharging the steam, communicated with both sides of the piston during its reciprocation through the steam. The drawing, Figure 3, shows a single cylinder engine wherein a part of the steam is exhausted through middle ports, which are uncovered by the piston in its movements; but nevertheless the peculiar construction of the latter was such that it could cover the exhaust ports for only a brief time in its travel, and as it did not cover them for a longer period it was unable to accomplish the results of the Stumpf piston, which covered the exhaust ports and kept them covered in its travel long enough to prevent the cold or expanded steam from flowing back to the hot zone. Opening the exhaust ports to allow the wet steam to escape, and then

quickly closing them to entrap the drier remaining steam, and compressing the same for reuse or intensifying the heat at the inlet end, were not suggested. Willans did not disclose the Stumpf combination, and his engine, though highly praised by the skilled in the art, was nevertheless unable to attain the superior economy in steam per horse power that was subsequently attained by the patent in suit.

Neither Todd nor Brotherhood discloses the combination of elements which were of the essence of the Stumpf invention, each lacking an essential feature, Todd the heating element at the inlet end and the cold exhaust, while Brotherhood, by the use of a short piston, erroneously kept the exhaust ports open too long on the return stroke, and hence failed in his efforts to eliminate initial condensation.

Importance is attached to the Creuzbaur patent, No. 332,499, which describes a *two-cylinder* uniflow engine with a steam jacket on the inlet end of the main cylinder and exhaust ports in the center, yet the patentee failed to use or disclose a piston capable of operating like the elongated piston of the claims in controversy, and he was unable to keep the exhaust ports closed long enough to prevent the expanded steam from permeating the hot cylinder walls; something Stumpf succeeded in accomplishing by adapting the elongated piston to coact with the exhaust ports to separate the hot and cold zones.

Another citation is that of the Dawbarn British patent, No. 16,497, wherein the construction comprises a system of piping for heating the cylinder head and the annular chamber or jacket adjacent thereto; the heat being supplied from an outside water heater. The patentee wished to prevent initial condensation, but, assuming his patent to have been more than a mere paper patent, I think the principle he employed was different from that employed by Stumpf. By the former's adaptation the entire cylinder and the exhaust ports were heated, and the piston used was incapable of covering the exhaust ports on its return stroke, and of keeping the cooler exhaust from the hot zone. He utterly failed, because of the incapacity of the piston used by him, to successfully eliminate initial condensation.

No single prior patent discloses the combination of a heated hollow cylinder cover to create a dry zone coacting with central exhaust ports, to disperse the wet steam into cooler zones, in the intermediate space between the inlet and exhaust, and then with an elongated piston to control the exhaust ports during expansion and compression of the steam to protect the zones from each other. Accordingly, the combination of the claims was new and novel, and the fact that one, or more, or all, of the elements were old, is immaterial, as the patentee herein was the first to combine them for improving thermal working conditions in uniflow engines to enable a "high ratio of expansion to be carried out with maximum efficiency in a single cylinder," and he is therefore entitled to protection from infringement by uniflow engines operating in substantially the same way and accomplishing the same result.

Defendant's expert, practically admitting that the combination was new, denies that the claimed results were secured thereby; but the record fairly shows, I think, that the invention was not without merit, and that the claimed results were in fact attained. While it perhaps

has not actually eliminated initial condensation, it has nevertheless decreased it, so that it may be said to be almost eliminated, and the evidence shows that the improvement makes it possible to operate the uniflow engine as economically as compound engines under like conditions. Hence it was not limited to a piston with extensions and peculiar forms of annular chambers, or to an annular chamber requiring that the cylinder head be recessed or counterbored to receive the piston. These were simply matters of construction, and it makes no difference, in view of the scope of the claims, whether the cylinder head of the patent in suit was extended by counterboring, or whether the heating jacket was enlarged at the head, or decreased in size, or whether the piston was elongated by placing extensions thereon; it being obvious that the same results were attainable by mechanical modifications.

Defendant has adapted in its engine the essential elements of the combination under discussion, arranged in substantially the same way to get the same result as complainant when its engine is used as a condensing engine. Claims 1 to 4, inclusive, are for the basic invention, and are not avoided by adapting auxiliary valves on the under side of the cylinder to relieve compression, for even with such valves the major portion of the wet steam was exhausted through the central ports, and the drier part trapped on the return stroke of the piston. The said auxiliary valves are not opened in operating the engine as condensing, and all the steam in the cylinder after exhaust is compressed to assist in keeping the inlet dry.

Claims 2 and 3 are not limited to two partial jackets; but, even with such limitation, the defendant does not avoid infringement, as in its engine both such partial jackets or chambers are present conforming substantially to those of complainant. In defendant's engine the hot and cold zones are insulated by an air belt spaced apart from the major jacket or heated inlet end, and, as shown in the model, the cylinder head is recessed to give the piston clearance space, in its reciprocations, from the cylinder ends, precisely as in complainant's construction.

Claim 8 is perhaps not as definite as it should be, but still I think the words "means for insulating said hot jacket from the cold parts of the cylinder steam space" imply keeping the piston head clear of the hot jacket. The specification referring thereto substantially says that to further avoid loss of heat from the hot jacket the piston end is insulated from the hot surfaces and that "this is effected by providing heads *41, 42,* on the end of the piston, which heads are out of contact with the hot surfaces."

Defendant contends, inter alia, that this claim was anticipated by the Creuzbaur patent, No. 332,499; but though such prior patent has an insulated piston, the insulation separates the cooler parts only, and not the hot parts from the cold—the essential feature of complainant's patent. Even if the claim is limited to specific means, the defendant does not avoid infringement thereof, as its engine has substantially the same way of insulating the hot and cold parts, viz. by recessing the cylinder to surround a portion of the piston end.

Defendant also disclaims infringement of claim 18. It is shown

that in defendant's engine steam may be discharged in varying quantities through the auxiliary ports, instead of through the central exhausts in operating the engine as a semi-uniflow engine, or as a combined uniflow and counterflow engine. Of course, any modifying improvement, merely in the way of retarding compression, does not avoid infringement of the basic invention, as no new mode of operation resulted. I am impressed with the view, however, that the claim is lacking in definiteness, and that the specification does not seem to support it. The thermal working condition of the uniflow engine did not depend on valves disposed axially in the cylinder. Defendant's auxiliary exhaust port and its valve control are embodied in the Skinner & Williams patent, No. 1,033,280, dated July 23, 1912. Claim 18 of the patent in suit was inserted by amendment dated July 30, 1912, though prior thereto the file wrapper and contents show it originally as claim 15. Nevertheless I am of the opinion that such claim refers to ports with check valves for releasing only a small portion of the steam, possibly for feeding water heaters, as testified by defendant's expert witness Wadsworth. In any event the claim, in view of the prior patent to Schmidt for a somewhat similar valve, but one operating more like defendant's, must be given a narrow construction only, and, so construed, defendant's engine does not infringe it.

As heretofore pointed out, the defendant employs the combination in suit, and thereby establishes zones of dry and wet steam, the latter exhausting at ports removed as far as possible from the heated inlet, and a piston long enough to trap the dry steam, first covering the exhaust ports, and only afterwards opening the auxiliary ports merely to reduce the steam for compressing in noncondensing operations, and has, I think, appropriated the invention embodied in the major claims herein.

Exhibit 18 (Stumpf book), a copy of which was filed in the Patent Office during the pendency of the application, was received in evidence over objection by defendant to support the contention that the improvement in question was of great economic value and received immediate recognition by the skilled in the art. I have not attached much weight to it, for with regard to the usefulness and value of the improvement I have altogether relied upon the oral testimony of complainant's witness Brown and the defendant's exhibit catalogue.

A decree may be entered, with costs, in favor of complainant in conformity with this opinion, holding claims 1, 2, 3, 4, and 8 valid and infringed by the A. Schreiber Brewing Company in its use of the uniflow engine built by the Skinner Engine Company, and claim 18 not infringed. So ordered.